**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ADRIAN ROSALIO REYES OVALLE;<br>JUAN MARIO REYES OVALLE;<br>MIGUEL ANGEL REYES OVALLE;<br>LUIS MIGUEL ROQUE OVALLE;<br>BENJAMIN RUIZ VAZQUEZ; and<br>PATRICK ULUPANO,<br>          Plaintiffs,<br>   v.<br>HARRIS BLACKTOPPING, INC. d.b.a.<br>   HARRIS PAVING;<br>JAMES W. HARRIS, JR.; and HARRY A.<br>HARRIS,<br>          Defendants | CIVIL ACTION NO. 2:21-cv-03591 |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiffs Adrian Rosalio Reyes Ovalle, Juan Mario Reyes Ovalle, Miguel Angel Reyes

Ovalle, Luis Miguel Roque Ovalle, Benjamin Ruiz Vazquez, and Patrick Ulupano (collectively,

"Plaintiffs"), by and through undersigned counsel, bring this action against Defendants Harris

Blacktopping, Inc. d.b.a. Harris Paving, James W. Harris, Jr., and Harry A. Harris (collectively,

"Defendants"), and hereby allege as follows:

## <u>NATURE OF ACTION</u>

1.      Defendants employed Plaintiffs between 2014 and 2020.

2.      During that time, Defendants failed to pay Plaintiffs for all hours worked and

failed to pay overtime when required by law.

3.      Defendants discriminated against Plaintiffs. On the basis of race, color, and/or

national origin, Plaintiffs were subjected to unlawful and unfavorable pay practices, were

assigned lower-paying and more demanding tasks, and were harassed with profane and

demeaning verbal abuse while at work.

4.	Following certain Plaintiffs' separation from Defendants' employ, Defendants contacted other companies with whom those Plaintiffs sought to work, to encourage those companies to refuse to work with Plaintiffs. Defendants successfully convinced at least one company to refuse to work with Plaintiffs.

5.	Plaintiffs seek relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*., (the "FLSA"), the Pennsylvania Minimum Wage Act of 1968, 43 P.S. § 333.101, *et seq.*, (the "PMWA"), the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1, *et seq.*, (the "WPCL"), the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e-2(a), and Pennsylvania common law breach of contract, unjust enrichment, and intentional interference with prospective contractual relations.

## JURISDICTION AND VENUE

6.	This Court has jurisdiction over Plaintiffs' FLSA claims pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

7.	This Court has supplemental jurisdiction over Plaintiffs' state law claims because those claims derive from a common nucleus of operative facts as the FLSA claims. 28 U.S.C § 1367.

8.	This Court has jurisdiction over Plaintiffs' 42 U.S.C. § 1981 claims under 28 U.S.C. §§ 1331, 1343.

9.	This Court has jurisdiction over Plaintiffs' Title VII claims pursuant to 28 U.S.C. § 1331.

10.	Plaintiffs Adrian Rosalio Reyes Ovalle, Juan Mario Reyes Ovalle, Luis Miguel Roque Ovalle, and Benjamin Ruiz Vazquez have exhausted the administrative remedies set forth

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5, as follows:

a. On or about February 24, 2021, the aforementioned Plaintiffs each filed Charges of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Harris Blacktopping, Inc. d.b.a. Harris Paving ("Defendant Harris Blacktopping").

b. On August 30, 2021, the EEOC issued Notices of Right to Sue to the aforementioned Plaintiffs. *See* Exhs. A-D.

c. Plaintiffs filed this action within 90 days of receipt of the Notices.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district. Defendants are incorporated in and conduct business in this judicial district.

**PARTIES**

**Plaintiffs**

**Adrian Rosalio Reyes Ovalle**

12. Adrian Rosalio Reyes Ovalle ("Plaintiff Adrian Reyes") worked for Defendants from approximately 2014 until September 1, 2020.

13. Plaintiff Adrian Reyes is Latino, brown-skinned, and of Mexican origin.

**Juan Mario Reyes Ovalle**

14. Juan Mario Reyes Ovalle ("Plaintiff Juan Reyes") worked for Defendants from approximately 2017 to October 2020.

15. Plaintiff Juan Reyes is Latino, brown-skinned, and of Mexican origin.

**Miguel Angel Reyes Ovalle**

16. Miguel Angel Reyes Ovalle ("Plaintiff Miguel Reyes") worked for Defendants from approximately 2017 to December 2019.

17.     Plaintiff Miguel Reyes is Latino, brown-skinned, and of Mexican origin.

**Luis Miguel Roque Ovalle**

18.     Luis Miguel Roque Ovalle ("Plaintiff Luis Roque") worked for Defendants from approximately May 2020 until October 2, 2020.

19.     Plaintiff Luis Roque is Latino, brown-skinned, and of Mexican origin.

**Benjamin Ruiz Vazquez**

20.     Benjamin Ruiz Vazquez ("Plaintiff Benjamin Ruiz") worked for Defendants from approximately 2019 to October 2020.

21.     Plaintiff Benjamin Ruiz is Latino, brown-skinned, and of Mexican origin.

**Patrick Ulupano**

22.     Patrick Ulupano ("Plaintiff Patrick Ulupano") worked for Defendants from approximately 2015 to December 2018.

23.     Plaintiff Patrick Ulupano is a Pacific Islander, brown-skinned, and of Samoan origin.

24.     Plaintiff Patrick Ulupano is the brother of the wife of Plaintiff Adrian Reyes. Defendants and their agents perceived Plaintiff Patrick Ulupano as related to Plaintiff Adrian Reyes, and of the same national origin—Mexican—as Plaintiff Adrian Reyes.

**<u>Defendants</u>**

**Harris Blacktopping, Inc. d.b.a. Harris Paving**

25.     Defendant Harris Blacktopping is a Pennsylvania business corporation with its registered address at 869 Sandy Run Road, Yardley, PA 19067 and a Department of State Corporation Bureau Entity Number of 958178.

26.     Defendant Harris Blacktopping conducts business out of an office in Washington Crossing, Pennsylvania and a workshop in Morrisville, Pennsylvania. It operates throughout Bucks County, Pennsylvania, and the surrounding areas.

27.     Defendant Harris Blacktopping employs individuals in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206-207.

28.     Upon information and belief, the annual gross volume of sales made or business done by Defendant Harris Blacktopping exceeds $500,000.

29.     At all times relevant to this lawsuit, Defendant Harris Blacktopping was acting by and through its principals, agents, servants, and employees including, but not limited to, Defendants James W. Harris, Jr. and Harry A. Harris.

**James W. Harris, Jr.**

30.     James W. Harris, Jr. ("Defendant James Harris") resides in Bucks County, Pennsylvania.

31.     At all relevant times, Defendant James Harris maintained a principal business address in Bucks County.

32.     Defendant James Harris is the President of Defendant Harris Blacktopping.

33.     At all times relevant to this lawsuit, Defendant James Harris was acting on his own behalf and/or on behalf of Defendant Harris Blacktopping.

34.     Defendant James Harris, along with Defendant Harry Harris, enjoyed the authority to hire, fire, and discipline Plaintiffs while they were employees of Defendant Harris Blacktopping.

35.     Defendant James Harris set the rate of pay for Plaintiffs while they were employees at Harris Blacktopping.

36.     Defendant James Harris, along with Defendant Harry Harris, promulgated work rules and assignments to Plaintiffs while Plaintiffs were employees of Defendant Harris Blacktopping.

37.     Defendant James Harris, along with Defendant Harry Harris, defined Plaintiffs' work schedules while Plaintiffs were employees of Defendant Harris Blacktopping.

38.     Defendant James Harris, along with Defendant Harry Harris, supervised Plaintiffs' work while Plaintiffs were employees of Defendant Harris Blacktopping.

39.     Defendant James Harris, along with Defendant Harry Harris, controlled Plaintiffs' employee records, including payroll and record of hours worked. Defendant James Harris sometimes instructed the Harris Blacktopping office manager to alter downward the record of the number of hours Plaintiffs worked.

40.     Defendant James Harris is an employer under 29 U.S.C. § 203(d), 43 P.S. §§ 260.2a; 333.103(g), and regulations promulgated thereunder, and is jointly and severally liable with Defendants Harris Blacktopping and Harry A. Harris.

**Harry A. Harris**

41.     Harry A. Harris ("Defendant Harry Harris") resides in Bucks County, Pennsylvania.

42.     At all relevant times, Defendant Harry Harris maintained a principal business address in Bucks County.

43.     Defendant Harry Harris is the Vice President of Defendant Harris Blacktopping.

44.     At all times relevant to this lawsuit, Defendant Harry Harris was acting on his own behalf and/or on behalf of Defendant Harris Blacktopping.

45.     Defendant Harry Harris, along with Defendant James Harris, enjoyed the authority to hire, fire, and discipline Plaintiffs while they were employees of Defendant Harris Blacktopping.

46.     Defendant Harry Harris, along with Defendant James Harris, promulgated work rules and assignments to Plaintiffs while Plaintiffs were employees of Defendant Harris Blacktopping.

47.     Defendant Harry Harris, along with Defendant James Harris, defined Plaintiffs' work schedules while Plaintiffs were employees of Defendant Harris Blacktopping.

48.     Defendant Harry Harris, along with Defendant James Harris, supervised Plaintiffs' work while Plaintiffs were employees of Defendant Harris Blacktopping.

49.     Defendant Harry Harris, along with Defendant James Harris, controlled Plaintiffs' employee records, including payroll and record of hours worked.

50.     Defendant Harry Harris is an employer under 29 U.S.C. § 203(d), 43 P.S. §§ 260.2a; 333.103(g), and regulations promulgated thereunder, and is jointly and severally liable with Defendants Harris Blacktopping and James Harris.

## STATEMENT OF FACTS

51.     Defendant Harris Blacktopping performs asphalt paving, construction, landscaping, and resurfacing services for highways, roadways, parking lots, tennis courts, and driveways, among other tasks.

52.     Defendant Harris Blacktopping bids on and accepts contracts throughout southeastern Pennsylvania and New Jersey.

53.     Defendant Harris Blacktopping pays workers at different rates depending on the task they perform and the contract they are completing.

   a.     Workers operating large machinery are paid at a significantly higher hourly rate than workers who perform manual labor like shoveling and raking asphalt.

   b.     Workers performing contracts for local governments, which are covered by the Prevailing Wage Act ("PWA"), 43 P.S. § 165, *et seq*., are also paid at significantly higher hourly rates.

54.     Operating large machinery is significantly less physically demanding than performing manual labor. The insides of certain machines are air-conditioned.

55.     Each day, employees of Defendant Harris Blacktopping must travel to the worksites, wherever they are located, to work for the day.

**Contract Formation**

56.     At the suggestion of a friend, Plaintiff Adrian Reyes approached Defendant Harry Harris about a job working for Harris Blacktopping. In or around 2014, Plaintiff Adrian Reyes and Defendant Harry Harris spoke in person about the type of work Defendants needed to be done and about Plaintiff Adrian Reyes's work experience.

57.     Defendant Harry Harris told Plaintiff Adrian Reyes that he would discuss an employment offer with Defendant James Harris. Eventually, Defendants Harry Harris and James Harris offered to pay Plaintiff Adrian Reyes a starting rate of $19 per hour worked, and to employ him as a roller machine operator. Plaintiff Adrian Reyes made a counter offer of $20 per hour worked, which Defendants James and Harry Harris accepted.

58.     Plaintiff Adrian Reyes learned early in his tenure working for Defendants that part of the work entailed completing projects for government contracts that paid an elevated hourly

rate. In those early days, Defendants typically paid Plaintiff Adrian Reyes an elevated hourly rate, as required by law, for such work.

59.     In or around 2017, Plaintiff Adrian Reyes told Defendant James Harris that Plaintiff Juan Reyes was looking for work. Defendant James Harris told Plaintiff Adrian Reyes that Defendant Harris Blacktopping would pay Plaintiff Juan Reyes $21 per hour worked. Defendant James Harris told Plaintiff Adrian Reyes that, aside from base rate of pay, Plaintiff Juan Reyes's terms of employment would be the same as Plaintiff Adrian Reyes's terms of employment.

60.     Plaintiff Juan Reyes accepted this offer by informing Plaintiff Adrian Reyes (who conveyed this agreement to Defendant James Harris) and by reporting to work and performing labor on the first day Defendant James Harris requested Plaintiff Juan Reyes appear.

61.     In or around 2017, Plaintiff Adrian Reyes told Defendant James Harris that Plaintiff Miguel Reyes was looking for work. Defendant James Harris told Plaintiff Adrian Reyes that he would pay Plaintiff Miguel Reyes $16 per hour worked. Defendant James Harris told Plaintiff Adrian Reyes that, aside from base rate of pay, Plaintiff Miguel Reyes's terms of employment would be the same as Plaintiff Adrian Reyes's terms of employment.

62.     Plaintiff Miguel Reyes accepted this offer by informing Plaintiff Adrian Reyes, (who conveyed this agreement to Defendant James Harris) and by reporting to work and performing labor on the first day Defendant James Harris requested Plaintiff Miguel Reyes appear.

63.     In or around 2020, Plaintiff Adrian Reyes asked Defendant James Harris if there was a job opening for Plaintiff Luis Roque. Defendant James Harris told Plaintiff Adrian Reyes that there was a job opening, which Plaintiff Adrian Reyes conveyed to Plaintiff Luis Roque.

Defendant James Harris told Plaintiff Adrian Reyes that, aside from base rate of pay and not being hired as an operator, Plaintiff Luis Roque's terms of employment would be the same as Plaintiff Adrian Reyes's terms of employment.

64.     Plaintiff Luis Roque accepted this offer by informing Plaintiff Adrian Reyes (who conveyed this agreement to Defendant James Harris) and by reporting to work and performing labor on the first day Defendant James Harris requested Plaintiff Luis Roque appear.

65.     In or around 2019, Plaintiff Adrian Reyes asked Defendant James Harris if there was a job opening for Plaintiff Benjamin Ruiz. Defendant James Harris told Plaintiff Adrian Reyes that there was a job opening, which Plaintiff Adrian Reyes conveyed to Plaintiff Benjamin Ruiz. Defendant James Harris told Plaintiff Adrian Reyes that, aside from base rate of pay and not being hired as an operator, Plaintiff Benjamin Ruiz's terms of employment would be the same as Plaintiff Adrian Reyes's terms of employment.

66.     Plaintiff Benjamin Ruiz accepted this offer by informing Plaintiff Adrian Reyes (who conveyed the agreement to Defendant James Harris) and by reporting to work and performing labor on the first day Defendant James Harris requested Plaintiff Benjamin Ruiz appear.

67.     In or around 2015, while Plaintiff Patrick Ulupano was living in Portland, Oregon, Plaintiff Patrick Ulupano's sister, Margaret, spoke to Defendant James Harris about a job for Plaintiff Patrick Ulupano. Defendant James Harris told Margaret and Plaintiff Adrian Reyes that he would offer a job to Plaintiff Patrick Ulupano if Plaintiff Patrick Ulupano moved to Pennsylvania. Defendant James Harris told Margaret and Plaintiff Adrian Reyes that, aside from base rate of pay and not being hired as an operator, Plaintiff Patrick Ulupano's terms of employment would be the same as Plaintiff Adrian Reyes's terms of employment.

68.     Plaintiff Patrick Ulupano accepted the offer by informing Margaret, who conveyed his agreement to Defendant James Harris. Plaintiff Patrick Ulupano then moved to Pennsylvania. He attended his first day of work at Defendant Harris Blacktopping shortly thereafter.

69.     During the course of Plaintiffs' employment with Defendants, Defendants informed Plaintiffs that Defendants would provide Plaintiffs with paid vacation days each year, and that Defendants would pay Plaintiffs for unused vacation days at the point Plaintiffs separated from employment at Harris Blacktopping.

**Wage Violations**

70.     Plaintiffs recorded hours worked by handwriting them in notebooks or on timecards.

71.     Plaintiffs' records of hours worked typically included the location of the job and whether the hours were performed on a PWA contract.

72.     On a weekly basis, Plaintiffs submitted their timesheets to Defendant Harris Blacktopping.

73.     Defendants paid Plaintiffs at various hourly rates, depending on the job assigned to them.

a.     Defendants assigned each Plaintiff an individual base hourly rate of pay (the "base rate"). Defendants agreed with some Plaintiffs on base rates prior to those Plaintiffs' first day of work. Defendants informed other Plaintiffs upon arrival to work what their base rate would be. *See supra* ¶¶ 56-69.

i. Defendants raised employees' base rates slowly over time.

ii. Defendants agreed to pay Plaintiffs this base rate when Plaintiffs performed manual labor on weekdays on contracts not covered by the PWA.

iii. Plaintiffs' initial base rates were as follows: Plaintiff Adrian Reyes, $20/hour; Plaintiff Juan Reyes, $21/hour; Plaintiff Miguel Reyes, $17/hour; Plaintiff Luis Roque, $20/hour; Plaintiff Patrick Ulupano, $17/hour.

b. Defendants typically paid employees at various elevated hourly rates of pay when they worked on contracts on weekdays covered by the PWA.

i. When employees performed manual labor on contracts covered by the PWA, Defendants paid employees at elevated hourly rates mandated by the PWA (a "labor PWA rate").

ii. When employees operated machinery on contracts covered by the PWA, Defendants paid employees at elevated hourly rates mandated by the PWA (an "operator PWA rate").

iii. Upon information and belief, operator PWA rates were always higher than labor PWA rates.

74. Defendants sometimes paid Plaintiffs at their individual base rates for hours that should have been compensated at a labor PWA rate or at an operator PWA rate.

75. Defendants sometimes paid Plaintiffs at a labor PWA rate for hours that should have been compensated at an operator PWA rate.

76. Although Plaintiffs recorded their hours worked on timecards and submitted them to Defendants, when Plaintiffs received their pay, often several hours of wages per week were missing.

77.     Plaintiffs typically worked more than forty (40) hours between Monday and Friday. As discussed in more detail below, Plaintiffs regularly performed additional hours of work on weekends.

78.     Over the course of a "workweek" (defined as spanning Monday through Sunday by Defendants' payroll system) Plaintiffs routinely worked more than forty (40) hours.

79.     Defendants were aware of the work beyond forty (40) hours in a week that Plaintiffs performed because Defendants instructed Plaintiffs when and where they should work, because Defendants were typically present on worksites with Plaintiffs, because Defendants and Plaintiffs communicated via text message and telephone conversation about work assignments, and because Plaintiffs sent Defendants records of hours worked (with the exception of hours Defendants instructed Plaintiffs not to record, as discussed otherwise throughout this Complaint).

80.     Defendants typically failed to pay an overtime premium of one and one-half (1½) times Plaintiffs' regular rate of pay for hours worked over forty (40) in a workweek. For example, Plaintiffs worked more than forty (40) hours in the workweek and were not paid an overtime premium for those hours during the following weeks:

   a.     Plaintiff Adrian Reyes worked more than forty (40) hours during the week ending on June 23, 2019. He was not paid an overtime premium.

   b.     Plaintiff Juan Reyes worked more than forty (40) hours during the week ending on June 23, 2019. He was not paid an overtime premium.

   c.     Plaintiff Miguel Reyes worked more than forty (40) hours during the week ending on June 23, 2019. He was not paid an overtime premium.

   d.     Plaintiff Luis Roque worked more than forty (40) hours during the week ending in August 30, 2020. He was not paid an overtime premium.

e.   Plaintiff Benjamin Ruiz worked more than forty (40) hours during the week ending on June 23, 2019. He was not paid an overtime premium.

f.   Plaintiff Patrick Ulupano worked more than forty (40) hours during the week ending on December 16, 2018. He was not paid an overtime premium.

81.   Plaintiffs worked on weekends.

a.   On weekends, Defendants instructed Plaintiffs not to record their hours.

b.   On weekends, Defendants paid Plaintiffs at a daily rate, rather than an hourly rate. Defendants did not tell Plaintiffs in advance how much they would be paid per day on the weekend.

c.   For weekend work, Plaintiffs' effective hourly rate was below their assigned base rate.

d.   Defendants paid Plaintiffs for work performed on weekends in cash.

e.   Plaintiffs usually worked two to three weekends per month.

f.   The hours Plaintiffs worked on weekends routinely caused Plaintiffs to work over forty (40) hours per week. Plaintiffs were not paid an overtime premium for these hours. For example:

i. During the workweek ending on May 5, 2019, Plaintiff Adrian Reyes worked more than forty (40) hours between Monday and Friday. He then worked additional hours over the weekend. He was not paid an overtime premium for hours beyond forty (40) that week.

ii. During the workweek ending on May 17, 2020, Plaintiff Juan Reyes worked more than forty (40) hours between Monday and Friday. He then worked additional hours

over the weekend. He was not paid an overtime premium for the weekend hours that he worked.

    iii.  During the workweek ending on May 5, 2019, Plaintiff Miguel Reyes worked more than forty (40) hours between Monday and Friday. He then worked additional hours over the weekend. He was not paid an overtime premium for hours beyond forty (40) that week.

    iv.  During the workweek ending on May 17, 2020, Plaintiff Luis Roque worked more than forty (40) hours between Monday and Friday. He then worked additional hours over the weekend. He was not paid an overtime premium for the weekend hours that he worked.

    v.  During the workweek ending on May 5, 2019, Plaintiff Benjamin Ruiz worked more than forty (40) hours between Monday and Friday. He then worked additional hours over the weekend. He was not paid an overtime premium for hours beyond forty (40) that week.

    vi.  During the workweek ending on December 9, 2018, Plaintiff Patrick Ulupano worked almost forty (40) hours between Monday and Friday. He then worked an additional day over the weekend, bringing his total hours worked for the week above forty (40). He was not paid an overtime premium for hours beyond forty (40) that week.

    g.    Upon information and belief, weekend hours worked by Plaintiffs were not recorded in Defendants' payroll system.

    82.    Defendants decided when workdays "officially" began and ended.

    a.    On a daily or almost daily basis, Plaintiffs were expected to perform work for Defendants before and after the workday "officially" began.

b.      Before the workday "officially" began, Defendants required Plaintiffs to clean and prepare machinery.

c.      Before the workday "officially" began, Defendants sometimes required Plaintiffs to arrive at the Harris Blacktopping workshop in Morrisville, load trucks with equipment and materials, and then drive to a worksite.

d.      After the workday "officially" ended, Plaintiffs were sometimes required to drive back to the Harris Blacktopping workshop in Morrisville and unload materials there.

e.      Defendants instructed Plaintiffs not to record hours worked before the workday "officially" began and after the workday "officially" ended.

f.      Plaintiffs were not compensated for work they performed before the workday "officially" began or after the workday "officially" ended.

83.    Some worksites were located more than an hour-and-a-half away from the Harris Blacktopping workshop in Morrisville and from Plaintiffs' homes in Bucks County.

84.    Plaintiffs were not compensated for the time they spent driving to and from worksites each day, regardless of whether they performed work before travel to, or after travel from, the day's worksite.

**Discrimination**

**Disparate Treatment**

85.    Plaintiffs experienced unlawful and unfavorable pay practices, were assigned lower-paying and more demanding tasks, and were subjected to profane and demeaning harassment while at work. Plaintiffs were treated in these ways on the basis of protected characteristics, including race, color, and/or national origin.

86.     Defendant Harris Blacktopping did not pay Plaintiffs for all hours worked. On many occasions, hours were missing from paychecks. *See supra* ¶ 76. Upon information and belief, Defendants compensated non-Latino, white, and/or American workers for all hours worked.

87.     Plaintiffs typically earned a lower base rate of pay than non-Latino, white, and/or American workers. *See supra* ¶¶ 73-73.a.iii.

88.     Upon information and belief, Defendant Harris Blacktopping typically gave Plaintiffs base rate pay raises at a slower rate than non-Latino, white, and/or American workers. *See supra* ¶ 73.a.i.

89.     Defendant Harris Blacktopping typically did not pay Plaintiffs one and a one-half (1½) times their normal rate of compensation for hours worked over forty (40) in a workweek. *See supra* ¶ 80. Upon information and belief, Defendant Harris Blacktopping paid workers who were non-Latino, white, and/or American one and a one-half (1½) times their normal rate of compensation for hours worked over forty (40) in a workweek more frequently than Defendant Harris Blacktopping paid it to Plaintiffs.

90.     Defendant Harris Blacktopping assigned Plaintiffs to work on contracts covered by the PWA less frequently than it assigned non-Latino, white, and/or American employees to work on such contracts.

91.     Defendant Harris Blacktopping sometimes failed to pay Plaintiffs at the correct labor PWA rate or operator PWA rate for work performed on contracts covered by the PWA. *See supra* ¶¶ 73.b.i-ii. Upon information and belief, Defendant Harris Blacktopping paid the correct rates to workers who were non-Latino, white, and/or American, who worked on jobs covered by the PWA.

92.     Defendant Harris Blacktopping assigned Plaintiffs to work on machinery less frequently than it assigned non-Latino, white, and/or American employees to work on machinery.

93.     When Plaintiffs asked to work as operators, Defendant Harris Blacktopping informed them that they were not permitted to do operating work.

94.     Plaintiffs were either qualified for operator jobs, or would have been qualified for operator jobs had they received training and practice that was only offered to non-Latino, white, and/or American workers.

95.     When Defendant Harris Blacktopping hired Plaintiff Adrian Reyes in or around 2014, Defendants James Harris and Harry Harris told Plaintiff Adrian Reyes that he was being hired as a machine operator.

96.     However, once Plaintiff Adrian Reyes began working for Defendants, Defendants James and Harry Harris assigned him tasks that consisted of manual labor, instead of the duties of operating machinery.

97.     Non-Latino, white, and/or American workers hired as operators were generally assigned duties operating machinery.

98.     Non-Latino, white, and/or American workers who were not hired as operators were nonetheless assigned duties operating machinery.

99.     Defendants required Plaintiffs to work on weekends. Defendants typically did not require non-Latino, white, and/or American employees to work on weekends.

100.    Defendants compensated Plaintiffs for weekend work at a flat rate per day, which amounted to an hourly rate below Plaintiffs' base rates. *See supra* ¶¶ 81.a-g. Upon information

and belief, non-Latino, white, and and/or American employees were not paid daily rates that amounted to hourly rates below their hourly base rates.

101. Plaintiffs were subject to different timekeeping requirements than non-Latino, white, and/or American employees, which caused Plaintiffs to be paid less than non-Latino, white, and/or American employees.

102. On a daily or almost daily basis, Defendant Harris Blacktopping required Plaintiffs to arrive at worksites before the workday "officially" began and stay after the workday "officially" ended. Defendant Harris Blacktopping did not pay Plaintiffs for that time. *See supra* ¶¶ 82.a-f. Non-Latino, white, and/or American employees did not arrive to worksites before the "official" day began and did not stay after the "official" day ended.

103. Therefore, non-Latino, white, and/or American employees were not required to perform unpaid labor before and after the "official" workday.

104. To reach jobsites from Plaintiffs' homes or from the Harris Blacktopping workshop in Morrisville, Plaintiffs sometimes had to drive up to three (3) hours per day. *See supra* ¶ 83.

105. Defendant Harris Blacktopping did not compensate Plaintiffs for time spent traveling to and from worksites. *See supra* ¶ 84.

106. Upon information and belief, Defendant Harris Blacktopping permitted non-Latino, white, and/or American workers to drive to the Harris Blacktopping main office and begin recording their hours before traveling to worksites.

107. Upon information and belief, Defendant Harris Blacktopping compensated non-Latino, white, and/or American for their travel time from the main office to worksites.

108.     Defendant Harris Blacktopping permitted non-Latino, white, and/or American workers to begin each season's work earlier in the year and therefore permitted those employees to work a greater number of hours than Latino, brown-skinned, and/or Mexican workers.

**Hostile Work Environment**

109.     Defendants James Harris and Harry Harris made Plaintiffs perform demanding, physical labor on asphalt, in the sun, during the summers, without lunch or water breaks. These shifts sometimes lasted more than ten (10) consecutive hours.

110.     Latino, brown-skinned, and/or Mexican workers suffered from heat stroke and fainted as a result of these work conditions on multiple occasions.

111.     When Plaintiffs brought water or Gatorade to work, Defendants James Harris and Harry Harris encouraged and permitted non-Latino, white, and/or American workers to take Plaintiffs' water or Gatorade without permission.

112.     Defendants Harry Harris and James Harris allowed non-Latino, white, and/or American workers to take lunch breaks and multiple additional paid breaks throughout the day.

113.     During the summer months, Defendants Harry Harris and James Harris permitted non-Latino, white, and/or American workers to take paid breaks for multiple hours at a time, while Latino, brown-skinned, and/or Mexican workers were required to continue working.

114.     While Plaintiffs performed manual labor in the sun, non-Latino, white, and/or American workers were permitted to rest in the air-conditioned cabs of machines.

115.     Defendants James Harris and Harry Harris instructed Plaintiffs that they were only to use machines when there was no non-Latino, white, and/or American worker available to use the machines instead.

116.     Defendant Harry Harris and James Harris assigned non-Latino, white, and/or American workers significantly less manual labor than they assigned to Plaintiffs. Instead, non-Latino, white, and/or American workers operated the machines.

117.     When Defendants James Harris and Harry Harris were displeased or angry with Plaintiffs, they threw asphalt on the ground for Plaintiffs to flatten. Although flattening asphalt is a task that is accomplished ordinarily and most easily with a machine, Defendants James Harris and Harry Harris required Plaintiffs to flatten it manually with shovels. Defendants James Harris and Harry Harris demeaned Plaintiffs in this way multiple times per week. Defendants James Harris and Harry Harris did not demean non-Latino, white, and/or American workers in this way.

118.     Non-Latino, white, and/or American coworkers frequently subjected Plaintiffs to degrading and offensive comments, profanity, insults, and yelling.

   a.     Plaintiffs were repeatedly called "border hoppers" and "motherfuckers."

   b.     Non-Latino, white, and/or American workers told Plaintiffs that they "wanted to tell Trump about" Plaintiffs.

   c.     When police drove past worksites, non-Latino, white, and/or American workers pointed at Plaintiffs and yelled to the police: "They're here!"

   d.     Non-Latino, white, and/or American workers repeatedly told Plaintiffs that the police were looking for them.

   e.     When Plaintiffs were occasionally permitted to operate machinery, the non-Latino, white, and/or American workers accused Plaintiffs of "stealing their jobs."

   f.     Non-Latino, white, and/or American workers told Plaintiffs to "go back to [their] country."

119.     Defendants James Harris and Harry Harris were frequently present on job sites and witnessed the verbal abuse described in paragraphs 118.a-f. When they witnesses abuse, they laughed alongside the non-Latino, white, or American workers who were perpetrating the abuse.

120.     Defendant Harry Harris perpetrated verbal abuse against Plaintiffs, alongside the non-Latino, white, and/or American workers. Defendant Harry Harris frequently called Plaintiffs "border hoppers" or "grass hoppers," said that Trump was going to deport Plaintiffs, and told Plaintiffs that the police driving past worksites were coming to arrest Plaintiffs.

121.     This verbal abuse described in paragraphs 118.a-f was perpetrated against Plaintiffs on a daily or weekly basis.

122.     Defendants did not discipline workers who engaged in verbal abuse against Plaintiffs.

123.     Plaintiffs felt humiliated, insulted, distressed, and inconvenienced by the verbal harassment they suffered.

124.     A reasonable person in Plaintiffs' position would have been detrimentally affected by Defendants' conduct.

**Plaintiffs' Complaints of Discrimination**

125.     Defendants did not have a formal process through which employees could make complaints about discriminatory treatment on the basis of race, skin color, and/or national origin.

126.     In fact, Defendants never communicated any means, formal or informal, through which employees could report discriminatory treatment.

127.     On several occasions, Plaintiffs complained to Defendant James Harris about discriminatory treatment.

128. Defendant James Harris did not take any action in response to remediate Plaintiffs' complaints.

129. In one instance following Plaintiffs' complaints of discrimination in November 2019, Defendant James Harris offered that Defendants would pay Plaintiff Adrian Reyes for additional work time at the beginning and end of the workday. Plaintiff Adrian Reyes had already been working that time without compensation. *See supra* ¶¶ 82.a-f. After approximately one week of making the additional payments to Plaintiff Adrian Reyes, Defendants ceased making those payments.

**Plaintiffs' Discharge and Defendants' Subsequent Conduct**

130. Defendants discharged Plaintiff Adrian Reyes in September 2020. Shortly thereafter, Plaintiffs Juan Reyes, Benjamin Ruiz, and Luis Roque ceased working for Defendant Harris Blacktopping because of disparate pay and a continued and escalating hostile work environment, which was so offensive and humiliating to them that they felt compelled to leave their jobs.

131. Although Defendants and Plaintiffs had previously agreed that Defendants would pay Plaintiffs for unused vacation hours when Plaintiffs left Defendants' employ, Defendants did not pay Plaintiffs for their unused vacation hours.

132. Defendants contacted multiple landscaping and construction companies with whom Plaintiffs Adrian Reyes, Juan Reyes, Benjamin Ruiz, and Luis Roque had sought work, including Blair Corporation. Defendants told those companies not to work with Plaintiffs Adrian Reyes, Juan Reyes, Benjamin Ruiz, and Luis Roque.

133. Upon information and belief, Defendants made these calls for the purpose of damaging Plaintiffs' ability to work for these third party companies.

134.     Defendants' efforts were successful with respect to Blair Corporation. After being

contacted by Defendants, Blair Corporation refused to work with Plaintiffs Adrian Reyes, Juan

Reyes, Benjamin Ruiz, and Luis Roque.

135.     Had Defendants not interfered with the relationship between Plaintiffs and Blair

Corporation, Plaintiffs Adrian Reyes, Juan Reyes, Benjamin Ruiz, and Luis Roque would have

obtained, at a minimum, several months of full time work from Blair Corporation. As a

consequence, Plaintiffs lost several months' pay.

**FIRST CAUSE OF ACTION**
**Violations of the Fair Labor Standards Act**
**All Plaintiffs Against All Defendants**

136.     All previous paragraphs are incorporated as though fully set forth herein.

137.     The FLSA requires that covered employees be compensated for all hours worked

in excess of forty (40) hours per week at a rate not less than one and one-half (1½) times the

regular rate at which he is employed. 29 U.S.C. § 207(a)(1).

138.     Defendants are subject to the wage requirements of the FLSA because they are

"employers" under 29 U.S.C. § 203(d).

139.     At all relevant times, Defendants are "employers" engaged in interstate commerce

and/or the production of goods for commerce within the meaning of the FLSA. 29 U.S.C. § 203.

140.     At all relevant times, Plaintiffs are covered employees entitled to the above-

described FLSA protections. 29 U.S.C. § 203(e).

141.     Plaintiffs are entitled to be paid overtime compensation for all hours worked over

forty in a workweek. 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.112.

142.     Defendants knowingly failed to compensate Plaintiffs at a rate of one-and-one-half (1½) times their regular hourly wage for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207(a)(1) or 29 C.F.R. § 778.112.

143.     In violating the FLSA, Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

144.     Defendants failed to comply in good faith with the FLSA.

145.     Pursuant to 29 U.S.C. § 216.6, Defendants are liable Plaintiffs for unpaid wages, liquidated damages, court costs, and attorneys' fees incurred in recovering the unpaid wages.

**SECOND CAUSE OF ACTION**
**Violations of the Pennsylvania Minimum Wage Act**
**All Plaintiffs Against All Defendants**

146.     All previous paragraphs are incorporated as though fully set forth herein.

147.     The Pennsylvania Minimum Wage Act of 1968 ("PMWA") requires that covered employees be compensated for all hours worked over forty (40) hours per week at a rate not less than one and one-half (1½) times the regular hourly rate at pay at which he is employed. 43 P.S. § 333.104(c); 34 Pa. Code § 231.41.

148.     Defendants are subject to the wage requirements of the PMWA because they are employers under 43 P.S. § 333.103(g).

149.     Defendants' compensation scheme that is applicable to Plaintiffs failed to comply with 43 P.S. § 333.104 and 34 Pa. Code § 231.41.

150.     As a consequence of the Defendants' violations of their rights under the PMWA, Plaintiffs are entitled to their unpaid wages, along with attorneys' fees and costs of the court, pursuant to 43 P.S. § 333.113.

**THIRD CAUSE OF ACTION**
**Violations of the Pennsylvania Wage Payment and Collection Law**
**All Plaintiffs Against All Defendants**

151.    All previous paragraphs are incorporated as though fully set forth herein.

152.    The Pennsylvania Wage Payment and Collection Law ("WPCL") requires employers timely pay all wages earned to their employees on a regularly-scheduled payday. 43 P.S. § 260.3(a).

153.    Defendants failed to pay Plaintiffs all of their wages on a regularly-scheduled payday in violation of 43 P.S. § 260.3(a).

154.    The WPCL requires employers to notify employees of the rate of pay at the time of hiring, and to notify employees of a change in the pay rate prior to the time of the change. 43 P.S. § 260.4.

155.    Defendants paid Plaintiffs at various rates without notifying Plaintiffs of changes in the pay rates prior to the time of the change in violation of 43 P.S. § 260.4.

156.    The WPCL provides that "[w]here wages remain unpaid for thirty days beyond the regularly scheduled payday . . . and no good faith contest or dispute of any wage claim including the good faith assertion of a right to set-off or counter-claim exists accounting for such non-payment, the employe[e] shall be entitled to claim, in addition [to the wages owed], as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater." 42 P.S. § 260.10.

157.    Defendants failed to pay Plaintiffs for all hours worked, and those wages remain unpaid for more than thirty (30) days.

158.    Defendants have no good faith reason for withholding any wages owed to Plaintiffs.

159. As a consequence of the Defendants' violations of Plaintiffs' rights under the WPCL, Plaintiffs are entitled to claim unpaid wages and liquidated damages of twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater, pursuant to 43 P.S. §§ 260.9a-260.10.

160. Plaintiffs are entitled to reasonable attorneys' fees under 43 P.S. § 260.9a(f).

**FOURTH CAUSE OF ACTION**
**Violations of the Civil Rights Act of 1866 as amended (Disparate Treatment)**
**All Plaintiffs Against Defendant Harris Blacktopping**

161. All previous paragraphs are incorporated as though fully set forth herein.

162. Defendants engaged in unlawful discrimination in violation of the Civil Rights Act of 1866 as amended. 42 U.S.C. § 1981.

163. Contracts of employment incorporate provisions required therein by federal and state law.

164. Plaintiffs are Latino, non-white, and/or of Mexican origin.

165. Defendants offered inferior terms and conditions of employment to Plaintiffs and other workers who were Latino, non-white, and/or of Mexican origin.

166. Defendants intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendants, in violation of 42 U.S.C. § 1981.

167. In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Plaintiffs.

168. Plaintiffs are entitled to compensatory damages, punitive damages, and attorneys' fees resulting from Defendants' denial of their rights to make and enforce contracts.

**FIFTH CAUSE OF ACTION**
**Violations of the Civil Rights Act of 1866 as amended (Hostile Work Environment)**
**All Plaintiffs Against Defendants Harris Blacktopping, James Harris, and Harry Harris**

169.    All previous paragraphs are incorporated as though fully set forth herein.

170.    Defendants engaged in unlawful discrimination in violation of the Civil Rights Act of 1866 as amended. 42 U.S.C. § 1981.

171.    Contracts of employment incorporate provisions required therein by federal and state law.

172.    Plaintiffs are Latino, non-white, and/or of Mexican origin.

173.    Defendants and their agents demeaned, degraded, insulted, and threatened Plaintiffs based on their race and/or color. The hostile work environment was severe and pervasive based on the nature of the harassment, including egregious statements made by employees related to Plaintiffs' race and/or color.

174.    These unlawful employment practices resulted in physical and emotional pain and suffering, embarrassment, and humiliation to Plaintiffs.

175.    Defendants intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendants, in violation of 42 U.S.C. § 1981.

176.    In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Plaintiffs.

177.    Defendants' conduct would have detrimentally affected a reasonable person in like circumstances.

178.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered damages, including extreme emotional distress, humiliation, inconvenience, and like injuries.

179.    Plaintiffs are entitled to compensatory damages, punitive damages, and attorneys' fees resulting from Defendants' denial of their rights to make and enforce contracts.

## SIXTH CAUSE OF ACTION
**Violations of the Civil Rights Act of 1866 as amended (Constructive Discharge)
Plaintiffs Juan Reyes, Luis Roque, and Benjamin Ruiz Against Defendant Harris
Blacktopping**

180.    All previous paragraphs are incorporated as though fully set forth herein.

181.    Defendant engaged in unlawful discrimination in violation of the Civil Rights Act of 1866 as amended. 42 U.S.C. § 1981.

182.    Contracts of employment incorporate provisions required therein by federal and state law.

183.    Plaintiffs are Latino, non-white, or of Mexican origin.

184.    Defendant intentionally deprived Plaintiffs of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of their contractual employment relationship with Defendants, in violation of 42 U.S.C. § 1981.

185.    Defendant constructively discharged Plaintiffs by creating a hostile work environment because of Plaintiffs' race, color, and/or national origin so intolerable that a reasonable employee would feel forced to resign, in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981.

186.    Plaintiffs resigned because the harassment they experienced was unbearable and compelled them to resign.

187.    In its discriminatory actions as alleged above, Defendants acted with malice or reckless indifference to the rights of Plaintiffs.

188.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered damages, including lost wages and benefits, emotional distress, humiliation, inconvenience, and

like injuries.

189.    Plaintiffs are entitled to compensatory damages, punitive damages, and attorneys' fees resulting from Defendants' denial of their rights to make and enforce contracts.

### SEVENTH CAUSE OF ACTION
**Breach of Contract**
**All Plaintiffs Against All Defendants**

190.    All previous paragraphs are incorporated as though fully set forth herein.

191.    Defendants entered into contracts with Plaintiffs and each party's acceptance was supported by good and valuable consideration. Plaintiffs agreed to provide labor to Defendants. Defendants agreed to compensate Plaintiffs at agreed upon and legally mandated wage rates and to pay Plaintiffs for any unused vacation time.

192.    Plaintiffs fulfilled their contractual obligations by performing labor for Defendants.

193.    Defendants breached their contractual obligations by failing to pay Plaintiffs for all hours worked at agreed upon base rates, by failing to compensate Plaintiffs at elevated rates on public works projects covered by the PWA, and by failing to pay Plaintiffs their unused vacation time at the termination of their employment with Defendants.

194.    Because Defendants breached the contracts, Plaintiffs suffered financial losses.

195.    Plaintiffs are entitled to monetary damage sufficient to place them in the financial position they would have been in but for Defendants' breach.

### EIGHTH CAUSE OF ACTION
**Breach of Contract**
**Plaintiff Adrian Reyes Against All Defendants**

196.    All previous paragraphs are incorporated as though fully set forth herein.

197.     Plaintiff Adrian Reyes and Defendants agreed that Plaintiff Adrian Reyes would perform operator duties and be compensated accordingly.

198.     Plaintiff Adrian Reyes fulfilled his contractual obligations by performing tasks Defendants assigned him to complete.

199.     Defendants breached their duties by assigning Plaintiff Adrian Reyes primarily manual labor duties, including on public works projects covered by the PWA, and compensating him at the lower wage rates reserved for manual labor.

200.     Because Defendants breached the contract, Plaintiff Adrian Reyes suffered financial losses.

201.     Plaintiff Adrian Reyes is entitled to monetary damage sufficient to place him in the financial position he would have been in but for Defendants' breach.

## NINTH CAUSE OF ACTION
**Violations of Pennsylvania Common Law for Unjust Enrichment**
**All Plaintiffs Against All Defendants**

202.     All previous paragraphs are incorporated as though fully set forth herein.

203.     Defendants have received and benefitted from the uncompensated labor of Plaintiffs, such that to retain said benefit without compensation would be inequitable.

204.     Defendants devised and implemented a scheme to increase their profits by securing work from Plaintiffs without compensating them for the fair value of that work.

205.     Plaintiffs worked hours in a variety of context for which Defendants never compensated them.

a.     Plaintiffs worked hours during the workweek that they recorded, but then Defendants removed some of those hours on a regular basis. *See supra* ¶ 76.

b.      Plaintiffs performed off-the-clock work both at the beginning and at the end of the workday, on a daily or almost daily basis. Defendants did not compensate Plaintiffs for this work. *See supra* ¶¶ 82-82(f).

c.      Plaintiffs were required to drive to distant worksites, sometimes as far as an hour-and-a-half away from the Harris Blacktopping workshop and from Plaintiffs' homes. Defendants did not compensate Plaintiffs for time spent traveling. *See supra* ¶¶ 83-84.

206.    Plaintiffs also performed work for which they were compensated at unjustly low rates.

a.      Plaintiffs were sometimes not compensated at the time-and-a-half overtime premium for which work over forty hours in a week is fairly valued. The overtime premium is the fair market value for such hours because anything less than the overtime premium would be in violation of law.

b.      Plaintiffs were sometimes not paid at the prevailing wage rate required by state law for work completed on municipal government contracts. The prevailing wage is the fair market value for such work because any anything less than the prevailing wage would be in violation of law.

c.      Plaintiffs were paid less than their the fair market value for their labor when they provided labor on weekends.

207.    Contrary to all good faith and fair dealing, Defendants induced Plaintiffs to perform work while failing to compensate them fairly for all hours.

208.    Defendants received and benefited from the uncompensated and undercompensated labors of Plaintiffs such that Defendants were unjustly enriched at the expense of and to the detriment of the Plaintiffs.

209.    Defendants retained and continue to retain such benefits contrary to the

fundamental principles of justice, equity, and good conscience.

210.    Accordingly, Plaintiffs are entitled to judgment in the amount equal to the

benefits unjustly retained by Defendants.

## TENTH CAUSE OF ACTION
### Intentional Interference with Prospective Contractual Relations
### Plaintiffs Adrian Reyes, Juan Reyes, Luis Roque, and Benjamin Ruiz Against All Defendants

211.    All previous paragraphs are incorporated as though fully set forth herein.

212.    Plaintiffs had prospective contractual relationships with third-party construction,

paving, and landscaping companies.

213.    Defendants took purposeful action with the intent to harm the business

relationship between Plaintiffs and these third-party companies.

214.    Defendants had no privilege or justification for these intentional attempts to

undermine Plaintiffs' business relationships with third-party companies.

215.    Defendants' efforts to undermine these relationships were successful, preventing

Plaintiffs from working with third-party companies.

216.    Consequently, Plaintiffs are entitled to actual damages resulting from Defendants'

conduct.

## ELEVENTH CAUSE OF ACTION
### Race, Color, and/or National Origin Discrimination
### Disparate Treatment in Violation of Title VII
### Plaintiffs Adrian Reyes, Juan Reyes, Luis Roque, and Benjamin Ruiz Against Defendant Harris Blacktopping

217.    All previous paragraphs are incorporated as though fully set forth herein.

218.     Defendants engaged in unlawful discrimination on the basis of race, color, and/or national origin in violation of Section 703(a) of Title VII of the Civil Rights Act, as amended. *See* 42 U.S.C. § 2000e-2(a).

219.     The effect of the conduct described in ¶¶ 85-135, *supra*, has been to deprive Plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because of their race, color, and/or national origin.

220.     These unlawful employment practices resulted in Plaintiffs being subject to unlawful pay practices solely because of their race, color, and/or national origin.

221.     The unlawful employment practices described in ¶¶ 85-135, *supra*, were intentional.

222.     The unlawful employment practices described in ¶¶ 85-135, *supra*, were done with malice or with reckless indifference to Plaintiffs' federally protected rights.

223.     As a direct and proximate result of Defendants' unlawful employment practices, Plaintiffs have suffered damages, including lost wages and benefits, emotional distress, humiliation, inconvenience, and like injuries.

**TWELFTH CAUSE OF ACTION**
**Race, Color, and/or National Origin Discrimination**
**Hostile Work Environment in Violation of Title VII**
**Plaintiffs Adrian Reyes, Juan Reyes, Luis Roque, and Benjamin Ruiz Against Defendant**
**Harris Blacktopping**

224.     All previous paragraphs are incorporated as though fully set forth herein.

225.     Defendants engaged in unlawful discrimination on the basis of race, color, and/or national origin in violation of Section 703(a) of Title VII of the Civil Rights Act, as amended. *See* 42 U.S.C. § 2000e-2(a).

226.     The effect of the conduct described in ¶¶ 85-135, *supra*, has been to deprive

Plaintiffs of equal employment opportunities and otherwise adversely affect their status as

employees because of their race, color, and/or national origin.

227.     These unlawful employment practices created a hostile work environment.

228.     These unlawful employment practices resulted in physical and emotional pain and

suffering, embarrassment, and humiliation to Plaintiffs.

229.     The unlawful employment practices described in ¶¶ 85-135, *supra*, were

intentional.

230.     The unlawful employment practices described in ¶¶ 85-135, *supra*, were done

with malice or with reckless indifference to Plaintiffs' federally protected rights.

231.     Defendants' conduct would have detrimentally affected a reasonable person in

like circumstances.

232.     As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered

damages, including extreme emotional distress, humiliation, inconvenience, and like injuries.

**THIRTEENTH CAUSE OF ACTION**
**Race, Color, and/or National Origin Discrimination**
**Constructive Discharge in Violation of Title VII**
**Plaintiff Juan Reyes, Luis Roque, and Benjamin Ruiz Against Defendant Harris**
**Blacktopping**

233.     All previous paragraphs are incorporated as though fully set forth herein.

234.     Defendant engaged in unlawful discrimination on the basis of race, color, and/or

national origin in violation of Section 703(a) of Title VII of the Civil Rights Act, as amended.

*See* 42 U.S.C. § 2000e-2(a).

235.     Plaintiffs are Latino, non-white, or of Mexican origin.

236.     Defendant constructively discharged Plaintiffs by creating a hostile work

environment because of Plaintiffs' race, color, and/or national origin so intolerable that a reasonable employee would feel forced to resign, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a).

237.    Plaintiffs resigned because the harassment they experienced was unbearable and compelled them to resign.

238.    Defendant's actions toward Plaintiffs were undertaken with malice and/or reckless indifference toward their federally protected rights.

239.    As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered extreme emotional distress, lost wages, humiliation, inconvenience, and like injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

1.    Monetary damages for unpaid overtime in an amount to be determined at trial, plus liquidated damages in an equal amount and interest, as provided by the FLSA, 29 U.S.C. § 216(b);

2.    Damages to Plaintiffs for unpaid overtime wages, in accordance with the PMWA, 43 P.S. § 333.113;

3.    Damages to Plaintiffs for actual and statutory liquidated damages in accordance with the WPCL, 43 P.S. §§ 260.9a-260.10;

4.    The full value of wages Plaintiffs would have received had it not been for Defendants' discriminatory and unlawful treatment of Plaintiffs, with interest until the date Plaintiffs are offered employment into a position substantially equivalent to the one that Plaintiffs occupied;

5.      Reinstatement into the positions Plaintiffs held, together with all benefits incident thereto;

6.      Front pay in the event reinstatement is not feasible;

7.      Compensatory damages against Defendants to compensate Plaintiffs for emotional distress, humiliation, inconvenience, and like injuries;

8.      Punitive damages to punish Defendants and to deter Defendants and others from like conduct;

9.      Damages to Plaintiffs in accordance with their contract law claims;

10.     Damages to Plaintiffs for unjust enrichment;

11.     Damages to Plaintiffs for intentional interference with prospective contractual relations;

12.     Liquidated and statutory damages to the fullest extent permitted under the law;

13.     Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

14.     Such other and further relief as this Court deems just and proper.


Dated: January 14, 2022

Respectfully submitted,


By: /s/ Samuel H. Datlof
Samuel H. Datlof, Esq.
    PA ID#: 324716
    Email: sdatlof@justiceatworklegalaid.org
Liz Chacko, Esq.
    PA ID#: 95115
    Email: lchacko@justiceatworklegalaid.org
Justice at Work
990 Spring Garden Street, Suite 300
Philadelphia, PA 19123
Telephone: (215) 733-0878

Nina Menniti, Esq.
    PA ID#: 326828
    Email: nmenniti@justiceatworklegalaid.org
Justice at Work
5907 Penn Ave., Suite 320
Pittsburgh, PA 15206
Telephone: (215) 733-0878

*Attorneys for Plaintiff*