# **Exhibit 10**

# United States Government Accountability Office, Immigration Benefits



Highlights of GAO-08-282, a report to congressional requesters

February 2008

# IMMIGRATION BENEFITS

## Internal Controls for Adjudicating Humanitarian Parole Cases Are Generally Effective, but Some Can Be Strengthened

### Why GAO Did This Study

The Immigration and Nationality Act requires that most visitors and immigrants to the United States obtain a visa. Aliens unable to obtain a visa, and with a compelling humanitarian need, may apply to the Department of Homeland Security (DHS) to be granted humanitarian parole. This permits an alien to enter the United States on a temporary basis. Parole responsibility rests with DHS's Humanitarian Assistance Branch (HAB), which was transferred to the U.S. Citizenship and Immigration Services (USCIS) in August 2007. In response to congressional requesters, GAO examined (1) the characteristics of those who applied for humanitarian parole since October 1, 2001, and (2) internal controls HAB designed to adjudicate applications along with the extent to which HAB adhered to them. To conduct this work, GAO analyzed HAB documents and data, such as its protocols and database of all parole applications since October 1, 2001; interviewed HAB officials about adjudication processes; and interviewed attorneys who had helped individuals file for parole.

### What GAO Recommends

To ensure that HAB processes applications consistent with its protocols, GAO recommends that DHS review HAB staffing levels; create a formal training program for adjudicating parole cases; and revise Web site instructions for parole applicants. DHS concurred with the recommendations and stated that it had begun taking actions to implement them.

To view the full product, including the scope and methodology, click on GAO-08-282. For more information, contact Richard Stana at (202) 512-8777 or StanaR@gao.gov.

### What GAO Found

The 8,748 humanitarian parole applications that HAB adjudicated from October 1, 2001, through June 30, 2007, displayed various characteristics—54 percent of the applicants were female and 46 percent, male; 45 percent of the applicants came from 11 countries, with the largest number from Mexico. Sixty-four percent of the requests for humanitarian parole were for family reunification or medical emergency. Persons under age 18 had a 35 percent grant rate—higher than the rate for applicants over 18 and consistent with the stated purposes of humanitarian parole. Seventy-six percent of applications were denied; 24 percent were granted. Among multiple reasons cited for denial by adjudicators in a projectible sample of cases we analyzed, an estimated 57 percent of applicants had not exhausted other avenues of immigration available to them before applying for humanitarian parole, as generally is required. Data analysis revealed few differences in parole denial rates with regard to gender or, with two exceptions, country of residence. While denial recommendation rates for individual adjudicators varied, HAB officials stated that this is expected because the facts and circumstances of cases vary and adjudicators have different backgrounds and experiences that might affect their reviews of an application.

HAB has designed internal controls to help ensure that requests for humanitarian parole are decided in accordance with applicable guidelines; these controls have been functioning as intended. Specifically, HAB has, among other controls, clear and detailed written policies and procedures, including a requirement that every application be reviewed by two adjudicators and that if they disagree, a third is to make a "tie-breaking" recommendation. A final decision is then made by the HAB Branch Chief or a designee, but if the Branch Chief decides to override the adjudicators' recommendations, the case is first discussed with higher-level officials. A computerized data system also records key information in every case. While HAB's controls are generally effective, three areas can be strengthened. First, following a transfer of HAB to USCIS, HAB may no longer have a sufficient number of permanent staff to ensure it continues to follow policies and procedures, since two adjudicators are insufficient to provide independent reviews of requests for reconsideration—HAB guidance recommends that such requests be reviewed by two additional adjudicators not previously involved. Second, HAB does not have a formal training program for new staff who may be detailed to help process applications. Such training is essential to ensure that criteria for granting and denying parole are applied consistently and fairly by the adjudicators. Third, USCIS's Web site has limited information about the circumstances under which a person may apply for humanitarian parole. More information and clearer instructions could reduce the number of applications from those who had not taken the steps generally required before applying for humanitarian parole, such as exhausting other available avenues for entry into the United States.

_____ **United States Government Accountability Office**